**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**DJETO BERISHAJ, et al.,**

                    **Plaintiff(s),**          **CASE NUMBER: 04-70998**
                                               **HONORABLE VICTORIA A. ROBERTS**
**v.**

**CITY OF WARREN, et al.,**

                    **Defendant(s).**
**and**

**STEVE GJONAJ, et al.,**

                    **Plaintiff(s),**          **CASE NUMBER: 05-71476**
                                               **HONORABLE VICTORIA A. ROBERTS**

**v.**

**CITY OF WARREN, et al.,**

                    **Defendant(s).**
_____/

**ORDER ON DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

        This matter is before the Court on a consolidated Motion for Summary Judgment

by the Defendants in *Berishaj v City of Warren,* 04-70998, and *Gjonaj v City of Warren*,

05-71476.  Each case arises from the same incident.  Defendants' motion is **GRANTED**

**IN PART** and **DENIED IN PART**.

**II.    BACKGROUND**

        In *Berishaj*, Plaintiffs Djeto Berishaj, Lena Berishaj, Kristina Berishaj, Preka

("Frank") Berishaj, Timothy Berishaj and Mark Nuculaj bring multiple civil rights claims against the City of Warren, Sergeant Lonnie Kirby and numerous Warren Police Officers: David Bonacorsi, Shawn Johnson, Stephen Colegio, John Newman, III, Ronald Wooster, Dean Toward, Chad Richardson, David Crown, Charles Rushton, Warren Gill, Mathew Milne, and Joseph Gula.[1]  In *Gjonaj*, Plaintiffs Steve Gjonaj and Tom Lulgjuraj also bring multiple civil rights claims against the City of Warren and Officer Newman. They additionally allege claims against Warren Police Officers Peter Warack, Steven Campbell, Craig Kirby and Brian Wojonowski.

Plaintiffs in each case allege that they were subjected to various acts of misconduct by Warren police officers on March 31, 2002, when the officers were called to the Royalty House banquet hall.  The Royalty House hosted a concert/party by an Albanian singer which began at 7:00 p.m.  Per Royalty House General Manager Roula Kappas, by approximately 8:30 p.m. the hall was filled to capacity (1000 people), but about 300 more people were trying to get into the hall.  Ms. Kappas notified the patrons outside that the event was sold out and refused to allow anyone else inside.  She says the patrons expressed displeasure but were not unruly.  But, Kappas soon learned that people already inside were letting people in through exit doors and that some people attempted to gain entrance through the roof.  So, just before 9:00 p.m. Kappas called the Warren police for assistance in dispersing the crowd in the parking lot.  The crowd inside was under control and, despite the number of people, Kappas did not find it

---

[1]The *Berishaj* Plaintiffs also sued Officers Daniel Beck and Darcy Leutzinger. However, in a stipulated Order, Plaintiffs dismissed all claims against Officers Beck and Leutzinger.

2

necessary to stop the party; she only wanted to prevent additional people from entering.

Kappas says that two or three patrol cars initially responded.  The officers stationed themselves at the entrance, advised the patrons that the party was sold out and asked them to leave.  The officers also blocked two entrances to prevent further cars from coming onto the lot.  For approximately 30 minutes there were no incidents.  But, some patrons were not obeying the directive to leave, a number of cars were illegally parked (and people inside ignored an announcement that they be moved), and people were still entering the lot from a third entrance that was not blocked.  So, at approximately 9:30, Kappas announced that the party was shut down.  Because Kappas estimated that there were approximately 1500 people inside at that time, additional officers were called to assist.

Kappas, who remained at the front door after the officers arrived, testified that most patrons exited the building in an orderly fashion.  However, she said some people were belligerent towards the officers and milled around the lot instead of going to their cars.  She said that some also swore at the officers and made comments suggesting that the police presence was racially motivated.  Kappas heard a group of young kids commenting that they could get more people and that they outnumbered the police.  She said that there was also a growing group of at least 20 people that made comments suggesting that they were planning to take revenge against the officers.

By 10:30 p.m., other police departments had been called.  Seven  police departments responded, including Roseville, Fraser, Sterling Heights, Clinton Township, Utica, Centerline and the State Police.  Some officers arrived in riot gear.  Defendants estimate that there were ultimately about 2000 patrons on the premises, and they

3

describe the crowd as hostile and the scene as a "near riot."

In the course of restoring order, fourteen arrests were made, including all of the Plaintiffs except Kristina Berishaj. Defendants assert that the arrests were necessitated by patrons who disobeyed orders to leave, attempted to incite a riot by encouraging others to take aggressive action against the officers, and physically assaulted officers.

Kappas witnessed one arrest of a young boy (whom she did not identify), who she said was very belligerent, refused multiple orders to leave, and antagonized a police dog. She also saw a woman jump on an officer's back while the officers attempted to contain her son, after the son attacked the officer.

Plaintiffs are Albanian. They and other witnesses deny Defendants' and Kappas' characterization of the temperament and behavior of the crowd. Plaintiffs also each deny behaving aggressively or belligerently towards officers. Therefore, they each assert that the alleged force used against them was unwarranted. Additionally, several Plaintiffs allege that they were subjected to gratuitous beatings or otherwise mistreated at the police station. Each Plaintiff's specific allegations are as follows:[2]

### A.     Timothy Berishaj

Timothy Berishaj was arrested for inciting a riot and resisting and obstructing officers. He alleges that he first saw two or three officers physically assaulting his mother, Plaintiff Lena Berishaj. When he went over and asked the officers what they were doing, one officer sprayed him with pepper spray (which did not severely affect

---

[2]Note that the Court omitted facts asserted by Plaintiffs in their brief which either were not supported by a citation to the record or inaccurately summarized the record cited.

4

him because he was wearing glasses) and ordered him to leave or be arrested.

Timothy says that he continued to verbally protest the officers' alleged behavior towards

his mother.  But, after speaking with his father and sister, he started to leave.

As he headed towards his car, he says that an officer came at him from behind.

When Timothy turned around, he says the officer, whom he could not identify, punched

him in the face.  Other officers then converged on him and punched, kicked and

sprayed him with pepper spray.  Timothy testified that he believes Officer Chad

Richardson sprayed him with pepper spray, Officer Stephen Colegio punched and

kicked him, and Officer Bozek (whose full name is not given and is not a named

Defendant), punched and pepper sprayed him.  And, after he was handcuffed, he says

Colegio dragged/carried him to a transport van while the others continued to pepper

spray, punch and kick him.  Timothy says that, prior to Officer Bozek's alleged assault

upon him, Officer Bozek agitated the crowd by referring to them as "dirty motherfuckers"

and using pepper spray on some people.

Two witnesses corroborate Timothy's claim that he was attacked by several

officers.  Suzanne Ljuvcovic says that she saw four officers rush Timothy from behind

as he was walking away from the Royalty House.  She says that she did not see

Timothy do anything prior to the alleged attack.  The officers simply jumped on him and

punched him.  Preta Dedvukaj also testified that he saw several officers kicking Timothy

while he was on the ground.

Plaintiff Tom Lulgjuraj testified that he was already inside the van when Timothy

was brought over to it.  He says two officers were holding Timothy up by his arms and

legs, while a third officer was hitting him in the face with a flashlight and a fourth officer

5

sprayed him in the eyes with pepper spray.  Both Timothy and Lulgjuraj say that, while

they sat in the transport van, an officer periodically opened the van doors and sprayed

pepper spray inside.

At the police station, Timothy says that officers carried him from the van and took

him head-first through the entry doors--using his head and/or face to open two or three

swinging doors.  Very shortly after being placed inside a holding cell, he says that an

officer ordered him to remove all of his clothes except his underwear.  Two officers then

took him down the hall and strapped him (by his arms and legs) into a restraint chair,

called the "Bam Bam" chair, and placed a football helmet on his head.  Timothy says he

did nothing to provoke the officers to place him in the chair and that he sat quietly once

strapped into it.  But, he says another officer, whom he now believes was Officer

Warren Gill, periodically walked by and swore at him and hit him on the head, arms and

legs.

Defendants offer a very different account of the entire incident.  They allege that,

at the Royalty House, Timothy was in a crowd chanting "Fuck you, come and get us,

fucking cops."  They say he also gathered a crowd of approximately 40 people and

chanted a similar refrain.  This behavior, per Defendants, incited others to become

disorderly.  Therefore, Defendants say they eventually told Timothy that he was under

arrest.  But as they approached him, he began to run and fell.  When he attempted to

run a second time, Officer Colegio caught him and took him to the ground.  Timothy

kicked at Colegio, striking him twice in the leg.  As Colegio attempted to straight-arm

Timothy, he (Timothy) lost his balance, turned his head away from the officer and

landed on the right side of his face.  Defendants say Timothy continued to resist while

6

being handcuffed.

At the precinct, Officer Charles Rushton says that he and Officer Mathew Milne led Timothy to a holding cell to await booking. But, when they reached the cell Rushton says Timothy became verbally combative when he and Milne were trying to collect his property and excess clothing. Per Rushton, jail policy only permits detainees to have one pair of socks and pants, underwear, and a shirt. So, Timothy was ordered to remove all clothing and accessories in excess of those limitations. Rushton said Plaintiff initially refused, but eventually ripped off all of his clothing except his underwear. All the while, Rushton said Timothy was screaming and making verbal threats to "kick their ass." Because of this behavior, which Rushton said he believed would lead to a physical assault by Timothy against him, Milne or other officers, Rushton says that he and Milne took Timothy to the restraint chair and left him there for approximately one and one-half hours until he calmed down.

Following a jury trial, Timothy was convicted on both counts--inciting a riot and resisting and obstructing officers.

### B.   Djeto Berishaj

Djeto Berishaj is Timothy's father. He was arrested for resisting and obstructing an officer.

Without provocation, Djeto says that he was accosted by an officer, later identified as Officer Chad Richardson, as he was trying to leave the Royalty House. He says Richardson grabbed him and threw him to the ground and, while using profanities, told him he was under arrest. Djeto says that he was not told why he was under arrest; he was simply cuffed and taken to the transport van.

7

When he and Richardson reached the van, Djeto says Richardson said he forgot to use pepper spray and sprayed him in the face.  Timothy Berishaj testified that he saw an officer use pepper spray on Djeto.  Djeto says that he subsequently fell down. Richardson and others then attempted to put him into the van until Timothy and Lena Berishaj shouted that he was diabetic.  Djeto was taken to the hospital, where he was seen and released back into custody.

Richardson says that Djeto was among a crowd of people who were yelling and making aggressive and hostile gestures towards the police.  But, Richardson said that he did not arrest Djeto until sometime later when Djeto began to approach him and other officers who were attempting to detain Timothy.  Richardson said that when he saw Djeto he remembered his earlier behavior, for which Richardson believed he had probable cause to make an arrest (for failing to disperse) but declined to do so because it was unsafe at that time.  So, when Djeto later approached, Richardson says he immediately grabbed Djeto and told him he was under arrest.  When Djeto pulled away, Richardson said that he took Djeto to the ground.  At the van, Richardson says Djeto suddenly dropped to the ground as though he was ill.  Although Richardson believed Djeto was faking, he summoned medical attention.

From the hospital, Djeto was taken to jail for booking.  After being held in a cell for approximately 45 minutes, Djeto says that two officers removed him from his cell and strapped him into a restraint chair with a helmet.  Officer Rushton testified that Officer Gill put Djeto into the chair, but Rushton did not recall a second officer assisting Gill. Djeto says that he was not causing a disturbance of any kind prior to being placed in the chair.  He was left in the chair for less than one hour.

8

Following a jury trial, Djeto was acquitted on all charges.

### C.   Lena Berishaj

Lena Berishaj was charged with resisting and obstructing and inciting a riot.  She says that she and her family were walking out of the Royalty House when several officers grabbed her son, Plaintiff Preka Berishaj, put him against the wall and held a baton to his neck.  She says that she verbally protested and pleaded with them to let him go.  In response, she says that an officer grabbed her from behind and threw her to the ground.  Someone then jumped on top of her, handcuffed her, sprayed her with pepper spray and threw her into the transport van.  She says that she scraped her knee and broke a tooth when she was thrown down.  She also says that the police dog on the scene stood on her legs while she was down, but did not bite or scratch her.

Officers Ronald Wooster and David Yager say that Lena was arrested after she jumped on Officer Bozek's back.  Wooster says that he heard her saying that Bozek was not going to take her son.  Yager states in his report that he pulled Lena off of Bozek while she was punching and kicking.  He says that she injured her right knee when she fell to the ground, and that he and Officer Brian Wojonowski struggled with her while she attempted to break free.  Yager says that he walked Lena to the van but she resisted being put inside.  So, Officer Joseph Gula sprayed her with mace and she was placed in the van without further incident.

Lena denies jumping on or otherwise touching any of the officers.  Witness Deljos Nuculovic somewhat corroborates Lena's claims.  He testified at Lena's trial that he saw her screaming, yelling and crying about her son.  Then he says that she began to run and an officer grabbed her, took her to the ground and two or three officers

9

jumped on top of her. He said that he did not see Lena do anything or jump on an officer before she was grabbed. Suzanne Ljuvcovic says that she saw four or five officers dragging Lena to the transport van. Although Lena was not resisting, Ljuvcovic says one of the officers had Lena by her hair and was punching her in the head. Ljuvcovic says that at least three officers then picked Lena up and flung her into the van.

At trial, Lena was acquitted of all charges.

**D.    Preka ("Frank") Berishaj**

Preka Berishaj was a juvenile. As he was leaving the Royalty House, he says he heard Warren officers making derogatory comments to the crowd, including a reference to them as "Arabs" and "Albanian faggots." Pl. Exh. O at p. 17. Preka says that he also saw one of the officers get close to his mother, Lena Berishaj, in what he felt was an intimidating manner. So, he told the officer something to the effect of "move out of the way" and "watch it." In response, he says an officer grabbed him and pushed him face first into a wall. An officer then took him to the ground and someone pepper-sprayed him. He was handcuffed and pepper-sprayed again. He was then taken to the transport van, pushed inside and pepper-sprayed again.

At the precinct, Preka says three to five officers came into his cell. One of the officers (who he now believes was Officer Shawn Johnson) accused him of jumping on his back (at the Royalty House), while another was putting on black leather gloves. Preka denied the accusation. But, while he was still cuffed, one of the officers slapped him. He says he fell to the floor dazed. He says the officers then brought him up to his knees such that he was bent over the bunk cushion. The officers then began to punch

10

and kick him in the face, groin and legs.  Tom Lulgjuraj, who was in the cell next to Preka, did not see the assault, but says he saw Officer John Newman go into Preka's cell and heard what sounded like slaps.  Later, Lulgjuraj says Preka told him that he was punched in the face, which Lulgjuraj says was badly bruised.

Officer Dean Toward said that, at the Royalty House, Preka appeared to be under the influence.  He says that he arrested Preka because he refused to leave and challenged officers to fight.  Toward says that Preka's general manner began to incite the crowd and led to the chaotic, riot-like atmosphere.  While attempting to place him under arrest, Toward says Preka tried to kick him in the groin.  So, Toward says he used a muscling technique to restrain and handcuff Preka, and that Officer Milne sprayed Preka in the face with pepper spray.  Officer Milne says that he witnessed Preka's assault on Toward.

Officer Shawn Johnson said Preka jumped on his back and said "let's get them" while Johnson was attempting to assist with another arrest.  And, at some point, Johnson said that Preka told people not to leave. Johnson says Officer Toward pulled Preka off of him and took Preka into custody.

Preka was charged with aggravated assault on a police officer and inciting a riot. He pled guilty to a lesser offense.

**E.    Tom Lulgjuraj**

Tom Lulgjuraj was also a juvenile.  He and his sister Tanya Lulgjuraj say that they were waiting in the lot for a third person in their party to return with the car.  While waiting, Tom and Tanya say that, without provocation, an officer came over and pushed Tom.  Tom turned and told the officer to "chill out."  They say the officer then grabbed

Tom and threw him to the ground.  Four other cops then jumped on him.  Tom says one officer kicked him in his side, handcuffed him and sprayed him with pepper spray. Tanya says she asked one of the officers to let Tom go because he has asthma and was not resisting.  In response, she says the officer sprayed her in the face with pepper spray.

At the transport van, Tom says Officer John Newman grabbed him by the hair and slammed his face against the van.  He was then thrown into the van.  While in the van, Tom says mace was periodically sprayed inside and he heard officers referring to the patrons as "[A]lbanian pieces of shit."

 Officer Newman testified that his partner, Officer Steven Campbell, arrested Lulgjuraj.  Newman did not witness the arrest or what precipitated it.  He also denies even seeing Lulgjuraj until they got back to the police station.  But, he says Campbell told him that Lulgjuraj attacked him.  Campbell was not deposed and his incident report was not attached to Defendants' brief.  But, in a Request to Petition (who authored it is unclear), it is alleged that Lulgjuraj yelled profanities towards the police and invited them to fight.  *See* Def. Exh. LL.  This taunting allegedly caused other patrons to fear leaving the building.  And, as Lulgjuraj was taken into custody, he allegedly twisted, turned and kicked at the officers.  He also gave officers false identification which indicated that he was older than his actual age.

Lulgjuraj was charged with inciting a riot, two counts of resisting and obstructing officers, and two counts of possession of forged documents.  He pled guilty to one count of possession of forged documents, in exchange for dismissal of the remaining charges.

**F.    Mark Nuculaj**

12

Mark Nuculaj said that he stood outside the Royalty House smoking a cigar when he saw a number of police officers arrive.  He says the officers immediately began making comments such as "you fucking Albanians got to leave."  An officer told Nuculaj to go to his car and leave.  However, he had left his car keys inside, so he asked an officer if he could go back in to get his wife and keys.  Nuculaj says the officer gave him permission to do so.  But, as he reached for the door, someone grabbed him by his hair, said "where the fuck you going you animals," and sprayed pepper spray in his face.  He could not see who grabbed or sprayed him.  He says two officers then took him to the transport van, searched and handcuffed him and put him into the van.

Nuculaj says that pepper spray was periodically sprayed inside the van while it was parked at the Royalty House.  And, when he arrived at the police station, he says that he was sprayed again while inside the van.  While in the garage at the station, he says that he and others were referred to by officers as "fucking [A]lbanians."  Finally, when he was in the holding area of the station, he says one officer threatened to put him in the restraint chair if he did not plead guilty, and he heard some officers make additional derogatory comments about Albanians.

In the incident report of Officers Craig Kirby and Brian Wojonowski, they say that Nuculaj exited the building and joined a hostile crowd gathered near the main entrance. They say Nuculaj and another patron led the crowd in taunting the officers by stating "take your fucking badges off and we'll kick your fucking ass."  Def. Exh. M.  Kirby and Wojonowski say that they arrested Nuculaj and the other leader of the crowd to prevent what they believed was a potential threat to officers and Royalty House employees. During a search of Nuculaj incident to his arrest, marijuana was found in his pants

13

pocket.

Nuculaj was charged with resisting and obstructing, inciting a riot and possession of marijuana.  The charges were ultimately dismissed without prejudice because the prosecutor was not ready to go forward.

### G.   Steve Gjonaj

Steve Gjonaj was charged with resisting and obstructing and inciting a riot.  He says that he saw a number of police officers from different cities when he walked out of the Royalty House.  As he was looking for his family, he says someone grabbed him from behind by his hair and threw him to the ground.  He verbally protested and explained what he was doing.  He says that two officers were handling him and they told him to shut up and hit him on his thigh three times with some kind of stick.  The officers then sprayed him with pepper spray while saying things like "[y]ou shouldn't be in this . . . country."  Pl. Exh. R. at p. 23.  Gjonaj was handcuffed and taken to the transport van.  He says he was maced several times, including when he was inside the transport van.  Prior to his arrest, Gjonaj says that he was not swearing, yelling or struggling with anyone, and that he did not resist in any way.

While in his holding cell at the jail, Gjonaj says an officer walked by and noticed him looking out.  So, the officer asked Gjonaj what he was staring at.  Gjonaj says he denied staring and apologized.  But, the officer opened the cell, came in and backslapped Gjonaj, causing him to fall back.  The officer then got on top of him and hit him three or four times in the face with his fist.  The officer then said things like "[g]o back to your own town," and "you guys shouldn't even be in this country."  Pl. Exh. R. at p. 30.

14

Officer Peter Warack arrested Gjonaj.  In his incident report he says that he heard Gjonaj say "fuckers can't do that" while looking towards the Royalty House entry doors.  Def. Exh. P.  Warack then ordered Gjonaj to leave.  In response, Gjonaj said "[f]ucking cops, fuck you!"  *Id.*  Warack ordered him to leave a second time.  Gjonaj continued to look towards the doors where officers were trying to arrest another patron, said "[g]et 'em," and rushed towards the officers.  *Id.*  Warack says that he then grabbed Gjonaj, took him to the ground, handcuffed him and took him to the transport van.

Gjonaj pled no contest to a lesser offense--attempted resisting and obstructing--with the agreement that the charge would be dismissed if he did not commit additional offenses for six months.

### H.   Kristina Berishaj

Kristina Berishaj was not arrested.  She said she walked out of the Royalty House with her parents and brother (Djeto, Lena and Preka Berishaj).  At some point, either during or after her parents and brother were arrested, she says an officer grabbed her with the apparent intention of taking her away.  But, she says her cousin stepped in and asked the officer to let her go because she was just a girl.  In response, she says another officer came from behind and sprayed pepper spray in her face.  She says her cousin then grabbed her.  It is apparent that Kristina eventually left the area, but she does not clearly indicate what happened after her cousin grabbed her.  Defendants assert that one can find from her testimony that Kristina resisted arrest and fled.  Her testimony does not, however, go that far and the record does not otherwise support such a finding.

In addition to the officers' alleged racial animus against Plaintiffs, they allege that

15

the officers were on a quest for revenge.  They contend that the officers sought to
avenge the death of a fellow officer, Detective Christopher Wouters, who was killed
almost two years prior to this incident on October 11, 2000.  Per Plaintiffs, Wouters was
killed by a person of Albanian descent who smuggled a gun into the Warren jail.
Plaintiffs base this claim on the testimony of Tommy Lee Jones, who was an inmate at
the Warren jail on the same evening and was housed in the same vicinity as Plaintiffs.
At the joint criminal trial of several of the Plaintiffs, Mr. Jones said that he heard officers
at the jail say that they did not like people of Plaintiffs' nationality because "they" killed a
police officer.

In their respective complaints, Plaintiffs allege that: 1) the City and Officers
deprived them of constitutional rights in violation of 42 U.S.C. §1983; 2) the City and
Officers conspired against them in violation of 42 U.S.C. §1985; 3) the City and Officers
committed various state law violations including assault and battery, false arrest and
imprisonment, intentional infliction of emotional distress, malicious prosecution and
gross negligence.  In Orders entered on December 7, 2005, however, the parties
stipulated to the dismiss all of the state law claims against the City, and some Plaintiffs
stipulated to dismiss certain state law claims (as indicated more specifically below)
against other Defendants.  Defendants request summary judgment on each of the
remaining claims.

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the

16

moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th  Cir. 1995).  To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c).  *Cox*, 53 F.3d at 149.  Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact.  Rule 56(e); *Cox*, 53 F.3d at 150.  The nonmoving party cannot rest on its pleadings, but must present significant

17

probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party.  *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.    ANALYSIS

### A.    Defendants Against Whom there are no Claims, and Claims for which there is no Evidence, Must be Dismissed

None of the *Berishaj* Plaintiffs make specific allegations against Defendants Lonnie Kirby, Bonacorsi, Wooster or Crown.  Officer Crown controlled the police dog on the scene, but no one alleges that they were harmed by the dog.  Lena Berishaj only claims that the dog stood on her legs for a brief time while she was being handcuffed. Therefore, the claims against Defendants Lonnie Kirby, Bonacorsi, Wooster and Crown are dismissed in their entirety.

The claims by Kristina Berishaj will also be dismissed.  She claims that she was gratuitously pepper-sprayed by one of the officers on the scene, but she has not identified the officer allegedly responsible and none of the Defendants admits interacting with her.  It is undisputed that there were a number of police officers from numerous jurisdictions on the scene.  Without an identification by Kristina or other witnesses, there is no means by which reasonable jurors can determine which, if any, of the Defendants was the perpetrator.  Therefore, all of her claims are dismissed.

### B.    Defendant Officers

#### i.    42 U.S.C. §1983

Plaintiffs allege that Defendants violated 42 U.S.C. § 1983. Section 1983 states

in relevant part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . subjects, or causes to be
> subjected, any citizen . . . the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

"To state a cause of action under §1983, a plaintiff must allege the deprivation of a right secured by the United States Constitution or a federal statute by a person who was acting under color of state law." *Spadafore v Gardner*, 330 F.3d 849, 852 (6th Cir. 2003). Here, Defendants do not dispute that they were acting under color of law, and Plaintiffs allege that Defendants violated their Fourth Amendment right not to be subjected to the excessive use of force.

In their respective Complaints, Plaintiffs actually allege multiple constitutional violations. However, in their responsive brief they only contend that there is a question of fact on their Fourth Amendment claims of excessive force. The Court, therefore, presumes that Plaintiffs have abandoned the other constitutional grounds asserted for their §1983 claim.

Defendants deny any constitutional violation and assert that they are entitled to qualified immunity in any event. Where the defense of qualified immunity is raised, the Court must first determine whether a constitutional violation has been established:

> A court required to rule upon the qualified immunity issue must
> consider, then, this threshold question: Taken in the light most
> favorable to the party asserting the injury, do the facts alleged show
> the officer's conduct violated a constitutional right? This must be the
> initial inquiry.
> * * *
> If no constitutional right would have been violated were the

19

allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

*Saucier v Katz*, 533 U.S. 194, 201 (2001)(internal citation omitted).

### a.   There is a Question of Fact Regarding Whether Excessive Force was Used Against Plaintiffs at the Royalty House

Claims of excessive force by police officers during an arrest must be analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v Connor,* 490 U.S. 386, 395 (1989).  In *Graham*, the Court stated that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id* at 396.  Therefore, when analyzing such a claim the Court must consider: 1) the severity of the crime; 2) whether the suspect poses an immediate threat to the safety of officers or others; and 3) whether the suspect is actively resisting arrest or attempting to flee.  *Id*.

The trial court must determine "whether the officers' alleged actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id* at 397.  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id* at 396.

A plaintiff need not suffer serious or permanent injury.  *Johnson v City of Ecorse*, 137 F.Supp.2d 886, 892 (E.D. Mich. 2001)(plaintiff's complaint of injury to his wrist from tight handcuffs sufficient).   However, there must be more force than "than the mere

20

technical battery that is inextricably a part of any arrest."  *Id.*

Plaintiffs present evidence through their own testimony and witness testimony that they were each beaten and/or sprayed with pepper spray without provocation and after they were already restrained.  Viewing the evidence in a light most favorable to Plaintiffs, there is evidence from which reasonable jurors could find that:

A.   Officers Richardson and Colegio kicked, punched and/or pepper sprayed Timothy Berishaj as he was attempting to leave, even though he denies creating a disturbance prior to the alleged attack or resisting arrest.

B.   Officer Richardson sprayed Djeto Berishaj with pepper spray after he was handcuffed and did not resist arrest.

C.   Officer Yager grabbed Lena Berishaj and threw her to the ground although she only verbally protested the arrest of her son, and that Officer Gula sprayed her with pepper spray after she was handcuffed, even though she did not resist arrest.

D.   Officer Milne repeatedly sprayed Preka Berishaj with pepper spray after he was restrained and handcuffed.

E.   Officer Campbell sprayed Tom Lulgjuraj with pepper spray after he was on the ground and handcuffed, even though he was not resisting arrest.  And, without provocation or cause, Officer Newman slammed Tom Lulgjuraj's face against the transport van.

F.   Officers Kirby and Wojonowski were the officers who grabbed Mark Nuculaj by his hair and sprayed him with pepper spray when he was simply trying to reenter the Royalty House with the permission of another

21

officer.

G.    Officer Warack was one of two officers who grabbed Steve Gjonaj from behind, threw him to the ground, hit him with a stick and sprayed him with pepper spray although he was behaving peaceably.

This evidence is sufficient to raise a question of fact regarding whether the Defendant Officers used more force than necessary under the circumstances against each of the Plaintiffs.  *See Phelps v Coy*, 286 F.3d 295, 301 (6th Cir. 2002)(finding Fourth Amendment violation where the defendant officer allegedly continued to beat plaintiff after he was detained and presented no threat).

Defendants argue that, even assuming the facts as alleged, the riotous atmosphere warranted the arrests and the use of pepper spray against even handcuffed Plaintiffs, whom they claim were verbally inciting others to be disorderly and to disobey the officers' order to leave.  Defendants say they were greatly outnumbered, the crowd was hostile and the use of pepper spray was the least invasive means of quieting instigating arrestees.  There is a question of fact, however, regarding the temperament of the crowd and whether any of the Plaintiffs incited the crowd.  Each Plaintiff denies being belligerent or encouraging others to disobey the officers.  They also deny seeing anyone else behave in this fashion.  Therefore, there is no basis for this Court to find as a matter of law that the force allegedly used against Plaintiffs at the Royalty House was reasonable under the circumstances.

**b.    There is a Question of Fact Regarding Whether Excessive Force was Used Against Some Plaintiffs at the Jail**

22

Steve Gjonaj and Timothy, Djeto and Preka Berishaj claim that excessive force was used against them at the police station. Such claims by Steve Gjonaj will be dismissed. He does not identify the officers who allegedly assaulted him in the jail. Preka, Timothy and Djeto Berishaj, however, presented sufficient evidence to raise a question of fact on their claims.

As a preliminary matter, there is no merit to the City of Warren's assertion that Preka, Timothy and Djeto Berishaj are precluded from asserting claims based on alleged mistreatment at the jail because they failed to exhaust their administrative remedies in accordance with the Prison Litigation Reform Act, 42 U.S.C. §1997e.[3] The PLRA states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, *by a prisoner confined in any jail, prison, or other correctional facility* until such administrative remedies as are available are exhausted.

(emphasis added). The express language of §1997e only prohibits persons who are still incarcerated from bringing §1983 actions until administrative remedies are exhausted. And, although the Sixth Circuit has yet to interpret this facet of §1997e, virtually every other circuit which has addressed the question interprets it in accordance with its plain language. *See Ahmed v Dragovich*, 297 F.3d 201, 210 (3rd Cir. 2002)(listing the circuits which have addressed the question). *See also Rose v Saginaw County*, 232 F.R.D. 267, 277 (E.D. Mich. 2005)(adopting the majority interpretation). Here, it is clear from

---

[3]The City also asserts this argument against Tom Lulgjuraj and Steve Gjonaj. However, Gjonaj's claim is dismissed for the reason already stated, and Lulgjuraj does not claim that he was mistreated at the jail.

23

the record that none of the Plaintiffs is incarcerated.  Therefore, §1997e does not apply.

Turning to the merits, the initial inquiry is whether Plaintiffs' claims are properly assessed under the Fourth or Fourteenth Amendment.  Plaintiffs argue their claim under the Fourth Amendment.  The Officers do not address the claims at all, focusing only on the alleged use of force at the Royalty House.  But, the City of Warren defends its policy regarding the use of the restraint chair under the Fourteenth Amendment.  There is a colorable question as to whether Preka, Timothy and Djeto Berishaj's claims arise under the Fourteenth, rather than the Fourth, Amendment.  One could argue that they became pretrial detainees once they arrived at the station.

There is a split of authority among the circuits regarding whether and when the Fourth or Fourteenth Amendment applies during the period of custody after arrest but before trial.  The distinction is important when claims of excessive force are leveled, because the Fourteenth Amendment imposes a different (and perhaps higher) burden of proof on the claimant.  Under the Fourth Amendment, a claimant need only show that the officers' alleged actions were not objectively reasonable.  *Phelps*, 286 F.3d at 299.

Under the Due Process Clause of the Fourteenth Amendment, a claimant (who is regarded as a pretrial detainee) is afforded the same protections as convicted prisoners under the Eighth Amendment's proscription against cruel and unusual punishment. *Thompson v County of Medina*, 29 F.3d 238, 242 (6th Cir. 1994).  Consequently, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v McMillian,* 503 U.S. 1, 6 (1992).  When considering the constitutionality of the use of a restraint chair, the Third Circuit holds that courts must consider whether the restraint is used in

24

furtherance of the jail's security interests or merely for punishment:

> "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting." [*Bell v Wolfish*, 441 U.S. 520, 540 (1979).] Obviously, "ensuring security and order at the institution is a permissible nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both. *Id* at 561[.] Consequently, "whether . . . restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive government purpose and whether they appear excessive in relation to that purpose. *Id.* Thus, there is a "distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may. *Id.*

> * * *

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. *Id* at 538-39[.]

*Fuentes v Wagner*, 206 F.3d 335, 342 (3rd Cir. 2000).

The question then, is when an arrestee becomes a pretrial detainee protected by the Fourteenth, rather than the Fourth, Amendment. The standard for making this decision in the Sixth Circuit is ambiguous in situations such as those presented here. The Sixth Circuit holds that the Fourth Amendment applies when, at the time of the alleged use of force, the claimant "was a free person . . . and the use of force occurred in the course of an arrest or other seizure." *Phelps*, 286 F.3d at 299. The Fourth Amendment, therefore, clearly applies during the period that the claimant is in the custody of the arresting officers. *Id* at 300. *See also McDowell v Rogers*, 863 F.2d

25

1302, 1306 (6th Cir. 1998)("[T]he seizure that occurs when a person is arrested continues throughout the time the person remains in the custody of the arresting officers.").  It is not clear whether the Fourth Amendment continues to apply after arresting officers turn an arrestee over to colleagues for processing at the jail and excessive force is allegedly used during the latter period of custody.  That is the situation presented in this case, and the Court did not find any cases in this or other circuits which further define "arresting officer" or which have the same or a similar factual scenario.

Additional briefing may be necessary to resolve this question before trial so that the jury is properly charged as to the standard which applies.  However, because Plaintiffs raise a question of fact under both standards, the Court does not need to resolve it to decide Defendants' motion.

Preka Berishaj testified that several officers came into his cell and beat him without provocation and while he was still cuffed.  He now believes that Officer Johnson was one of the officers.  Timothy Berishaj presented evidence that, without provocation, Officers Rushton and Milne strapped him into a restraint chair for one and one-half hours, and that (again without provocation) Officer Gill repeatedly struck him on the head, arms and legs while he was in the chair.  Djeto Berishaj testified that an officer, who Rushton says was Officer Gill, placed him in the restraint chair for a period of time less than one hour for no apparent reason.

Under the Fourth Amendment, and assuming the truth of Plaintiffs' claims, jurors could find that there was no objectively reasonable purpose for the beating allegedly inflicted on Preka, or for the officers use of the restraint chair on either Timothy or Djeto

26

Berishaj since Timothy and Djeto claim that they did nothing to provoke the restraint. Jurors could also find that there was no objectively reasonable reason for Officer Gill to strike Timothy repeatedly without provocation and while he was strapped in the chair and presenting no threat.  Therefore, Plaintiffs raise a question of fact under the Fourth Amendment.

Under the Fourteenth Amendment, because each Plaintiff denies being unruly or disruptive, jurors could find that neither the use of the restraint chair (in either instance) nor the alleged assaults upon Timothy and Preka was rationally related to a legitimate, nonpunitive government purpose, but was merely unconstitutional punishment.  *See Fuentes*, 206 F.3d at 342.  Therefore, there is also a question of fact when Plaintiffs' claims are considered under the Fourteenth Amendment.

Therefore, the Court finds that Plaintiff Gjonaj failed to establish a constitutional violation at the jail, but that Preka, Timothy and Djeto Berishaj sufficiently established that there is a question of fact as to whether their constitutional rights were violated at the jail.

### c.    Defendants are not Entitled to Summary Judgment on the Ground of Qualified Immunity

Because there is a question of fact regarding whether Plaintiffs' Fourth Amendment rights were violated, the Court cannot reach the question of qualified immunity on any of the Plaintiffs' claims of excessive force at the Royalty House and on Preka, Timothy and Djeto Berishaj's claims of excessive force at the jail.  *See Gardenhire v Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).  The question of qualified immunity is moot on Plaintiff Gjonaj's claims of excessive force at the jail.

Consequently, Defendants' motion for summary judgment on Plaintiffs' claims that excessive force was used against them at the Royalty House is denied in its entirety. Defendants' motion is also denied on Preka, Timothy and Djeto Berishaj's claims that excessive force was used against them at the jail.

### ii.   42 U.S.C. §1985

Plaintiffs allege that Defendants conspired to deprive them of equal protection of the law in violation of 42 U.S.C. §1985(3).

Although Plaintiffs' alleged this claim against the City of Warren as well, it appears from their failure to defend the claim in their response to Defendants' motion that they have abandoned the claim.

To sustain a claim under §1985(3), a plaintiff must prove:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Vakilian v Shaw*, 335 F.3d 509, 518 (6th Cir. 2003).  "The acts which are alleged to have deprived a plaintiff of equal protection must be the result of class-based discrimination." *Id* at 518-519.

As already stated, there is a question of fact regarding whether Defendants used excessive force against each Plaintiff, in violation of the Fourth Amendment (and for some Plaintiffs perhaps also the Fourteenth Amendment), by beating, spraying pepper spray and/or confining them to a restraint chair.  Therefore, elements two through four are satisfied.

There is sufficient evidence of a conspiracy.  In *Johnson v City of Ecorse*, 137 F.Supp.2d 886 (E.D. Mich. 2001), the Court denied summary judgment on plaintiff's §1985 claim where the two defendant officers allegedly forcefully removed plaintiff from a car, applied his handcuffs too tightly, and pulled, kicked and pushed him during the arrest.  The Court held that "a reasonable jury could conclude that Defendants . . . agreed between themselves to deprive Plaintiff . . . of his right to be free of excessive force, that they acted in furtherance of that conspiracy by manhandling Plaintiff unnecessarily, and that Plaintiff suffered injuries as a result of those acts."  137 F.Supp.2d at 894.

Similarly, reasonable jurors could find that these Defendants agreed between themselves to use excessive force against Plaintiffs.  At the Royalty House, there is evidence that at least two officers were involved in each Plaintiff's arrest, except for Djeto, and that Plaintiffs were beaten and/or pepper-sprayed during the course of those arrests.  At the jail, there is evidence that Preka was beaten by multiple officers and that Timothy and Djeto were placed into the restraint chair by two officers.  Under *Johnson*, this is sufficient evidence to raise a question of fact regarding whether the officers conspired to commit the alleged acts.  Therefore, the first element is also satisfied.

Finally, there is ample evidence from which jurors could find that Defendants' alleged actions were racially motivated.  As set forth above, several Plaintiffs and witnesses say that they heard Warren officers referring to Albanians in a derogatory manner (both at the Royalty House and the jail) and directing such comments to the crowd and Plaintiffs.

For all of these reasons, Defendants' motion for summary judgment on Plaintiffs'

29

§1985 claim is denied.

      **iii.**    **State Law Claims**

          **a.**    **Malicious Prosecution, False Arrest and False Imprisonment**

Plaintiffs Djeto and Lena Berishaj, Mark Nuculaj and Steve Gjonaj assert a claim of malicious prosecution.[4]  All of the Plaintiffs assert a claim of false arrest.  And, Lena and Djeto Berishaj assert a claim of false imprisonment against all of the Defendants except Gill, Rushton, Milne and Gula.[5]  Defendants presumed that Plaintiffs asserted a federal claim of malicious prosecution.  However, Plaintiffs do not indicate this in their response brief and it is not clearly alleged in the Fourth Amended Complaint. Therefore, the Court presumes that the claim is only asserted under state law.

Each of these claims is premised on lack of probable cause.  *See Peterson Novelties, Inc. v City of Berkley*, 259 Mich. App. 1, 18 (2003); *Rivers v. Ex-Cell-O Corp*, 100 Mich. App. 824, 832 (1981).  Although two of the Plaintiffs were acquitted at trial and one pled no contest, Plaintiffs do not dispute Defendants' assertion that probable cause was either found against each Plaintiff after a preliminary exam or effectively stipulated by waiver of the exam.  Therefore, Defendants argue that Plaintiffs are bound by the probable cause findings in state court.  Because of those findings, Defendants contend that these claims fail as a matter of law.

Plaintiffs only respond by asserting that summary judgment is not warranted with

---

[4]Plaintiffs Timothy and Preka Berishaj and Tom Lulgjuraj to dismiss this claim.

[5]The remaining Plaintiffs stipulated to dismiss this claim, and Lena and Djeto Berishaj stipulated to dismiss it as to Defendants Gill, Rushton, Milne and Gula.

regard to the claims of Lena and Djeto Berishaj, since they were acquitted and allege that the officers made false statements to procure their prosecutions.  The Court, therefore, proceeds on the presumption that all of the Plaintiffs, except Lena and Djeto Berishaj, have abandoned these state law claims.  Further, the Court finds that Lena and Djeto Berishaj raise a question of fact on each claim.

Generally, a finding of probable cause during state court criminal proceedings collaterally estops a defendant from basing subsequent civil claims on lack of probable cause.  *Darrah v City of Oak Park,* 255 F.3d 301, 311 (6th Cir. 2001); *White v Tamlyn,* 961 F.Supp. 1047, 1054 (E.D. Mich. 1997).  Collateral estoppel is not a bar, however, if officers made materially false assertions during the criminal proceedings which the state court relied upon to find probable cause.  *Darrah*, 255 F.3d at 311.

Based upon the Incident Reports prepared by Officer Richardson regarding Djeto Berishaj and Officer Yager regarding Lena Berishaj, Officer Daniel Beck swore out warrants against them.  *See* Def. Exh. II.  In Richardson's report, he claims that Djeto Berishaj acted in an aggressive manner that incited a riotous atmosphere and disobeyed orders to leave.  *Id.*  Officer Yager claims in his report that Lena Berishaj jumped on Officer Bozek's back while he was arresting someone else.  Def. Exh. T.  Djeto and Lena Berishaj deny these claims.  Therefore, there is a question of fact regarding whether the officers made false assertions which the state court relied upon to find probable cause.  Consequently, Djeto and Lena Berishaj are not estopped from asserting their claims of malicious prosecution, false arrest and false imprisonment.

Djeto and Lena have also presented sufficient evidence on the remaining elements of each claim.  "To prevail on a claim of false arrest or false imprisonment, a

plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause." *Peterson Novelties*, 259 Mich. App. at 18.  Because Djeto and Lena deny behaving in the manner Richardson and Yager allege as the basis for their respective arrests, there is a question of fact concerning the probable cause for their arrests.

"The elements of a cause of action for malicious prosecution are: (1) a criminal prosecution instituted against plaintiff by defendant, terminating in plaintiff's favor, (2) absence of probable cause for the criminal proceeding, and (3) malice or a primary purpose in bringing the action other than bringing the offender to justice." *Rivers*, 100 Mich. App. at 832.  Malice may be inferred from a lack of probable cause.  *Id* at 835.  It is undisputed that the state court case terminated in Plaintiffs' favor; they were both acquitted.  And, there is a question of fact concerning the probable cause for either arrest.  Consequently, the second and third elements are also satisfied.     Defendants' motion for summary judgment is denied as to Djeto and Lena Berishaj, but granted against all of the remaining Plaintiffs.

### b.    Gross Negligence

Plaintiffs allege that the Defendant Officers were grossly negligent.  Under Michigan statutory law, a governmental employee acting within the scope of his authority is entitled to governmental immunity from tort liability unless the plaintiff can establish that the employee's actions amounted to gross negligence:

> [E]ach officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while

32

acting on behalf of a governmental agency if all of the following are met:

 (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

 (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

 **(c) The . . . employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.**

M.C.L. §691.1407(2)(emphasis added).  To sustain a claim, a plaintiff must allege

substantially more than ordinary negligence.  *Maiden v Rozwood,* 461 Mich. 109, 122

(1999).  And, the requirement that the employee's actions be "the proximate cause" has

been interpreted to mean "the one most immediate, efficient, and direct cause

preceding an injury."  *Robinson v City of Detroit,* 462 Mich. 439, 459 (2000).

Plaintiffs each claim that they were beaten and/or sprayed with pepper spray

during the course of their arrest, although they did not resist arrest or otherwise provoke

the alleged physical assaults.  Reasonable jurors could find that such conduct by

Defendants, regardless of whether there was probable cause for an arrest, was "so

reckless as to demonstrate a substantial lack of concern for whether an injury" would

result.  Defendants' motion for summary judgment is denied.

### c.    Assault and Battery

"An assault is defined as any intentional unlawful offer of corporal injury to

another person by force, or force unlawfully directed toward the person of another,

33

under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact."  *Espinoza v. Thomas*, 189 Mich. App. 110, 119 (1991); *Smith v Tolberg*, 231 Mich. App. 256, 260 (1998).  "A battery is the wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact."  *Espinoza*, 189 Mich. App. at 119.  "Protection of the interest in freedom from unintentional and unpermitted [sic] contacts with the plaintiff's person extends to any part of his body or to anything which is attached to it and practically identified with it."  *Id.*

When an alleged assault and battery arises from an arrest, liability turns on whether the arrest was lawful and, if so, whether the amount of force used was reasonable.  When effecting a lawful arrest, an officer has the right to use the amount of force that is reasonably necessary under the circumstances to effect the arrest.  *Delude v Raasakka*, 391 Mich. 296, 303 (1974); *Tope v Howe*, 179 Mich. App. 91,106 (1989).  "[T]he measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary."  *Brewer v Perrin*, 132 Mich. App. 520, 528 (1984) (*quoting Barrett v United States*, 64 F.2d 148, 149 (D.C. Cir. 1933)(internal quotation marks omitted).  An officer may take reasonable action to protect himself in the course of an arrest or an attempted arrest.  *Delude*, 391 Mich. at 303.

Plaintiffs Nuculaj, Gjonaj and Lulgjuraj stipulated to dismiss their claims of assault and battery.  And, the remaining Plaintiffs (Timothy, Preka, Djeto and Lena Berishaj) stipulated to dismiss it as to Defendants Gill, Rushton, Milne and Gula.

With the exception of Djeto Berishaj, none of the remaining Plaintiffs alleges facts

34

from which reasonable jurors could find that they were subjected to an assault as it is defined under Michigan law.   Djeto Berishaj claims that Officer Richardson commented that he forgot to use pepper spray on him just before spraying him in the face.  This alleged preface by Officer Richardson, raises a question of fact regarding whether he committed an assault upon Djeto Berishaj.

Each of the remaining Plaintiffs, however, claims that he or she was grabbed by officers without warning (and often from behind); they do not claim that threats preceded the alleged batteries.  Therefore, there is no basis for reasonable jurors to find that any of the Plaintiffs, except Djeto Berishaj, were placed in imminent apprehension of an imminent contact before the alleged attacks occurred.

Each of the Plaintiffs raises a question of fact on their claims of battery.  They each claim that they were subjected to unprovoked, deliberate beatings and gratuitous use of pepper spray.  These alleged acts constitute a battery under Michigan law.

Defendants' motion for summary judgment on Plaintiffs' claim of assault is granted against all of the Plaintiffs except Djeto Berishaj; it is denied on all the battery claims.

### d.      Intentional Infliction of Emotional Distress

Although not yet formally adopted, Michigan courts recognize claims of Intentional Infliction of Emotional Distress (IIED).  *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985). To state a claim, Plaintiffs must prove: (1) 'extreme and outrageous' conduct;  (2) intent or recklessness;  (3) causation;  and (4) 'severe emotional distress.'  *Id.*  Quoting the Restatement, the *Roberts* court described the element of extreme and outrageous conduct as follows:

> Liability has been found only where the conduct has
> been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community. Generally, the case
> is one in which the recitation of the facts to an average
> member of the community would arouse his
> resentment against the actor, and lead him to exclaim,
> 'Outrageous!'

*Id* at 603.  Liability does not extend to "mere insults, indignities, threats, annoyances,

petty oppressions, or other trivialities." *Ledsinger v. Burmeister*, 114 Mich. App. 12, 18

(1982)(citing *Warren v June's Mobile Home Village & Sales, Inc*, 66 Mich. App. 386, 390

(1976)).  "Whether a defendant's acts were sufficiently outrageous depends upon the

context in which the defendant committed them."  *Bhama v Bhama*, 169 Mich. App. 73,

80 (1988).  For instance, the extreme and outrageous character of a defendant's

conduct may arise when a defendant abuses a relationship which puts him in a position

of actual or apparent authority over plaintiff or gives the defendant power to affect

plaintiff's interests. *Warren,* 66 Mich. App. at 391.

Again quoting the Restatement, the *Roberts* court described the severe

emotional distress requirement as follows:

> [Emotional distress] includes all highly unpleasant mental reactions,
> such as fright, horror, grief, shame, humiliation, embarrassment,
> anger, chagrin, disappointment, worry, and nausea. It is only where it
> is extreme that the liability arises. Complete emotional tranquillity is
> seldom attainable in this world, and some degree of transient and
> trivial emotional distress is a part of the price of living among people.
> *The law intervenes only where the distress inflicted is so severe that
> no reasonable man could be expected to endure it. (*emphasis in
> original).

422 Mich. at 609.  Seeking and receiving medical treatment is not a condition precedent

to satisfying the element of severe emotional distress.  *McCahill v Commercial Union*

36

*Ins. Co*, 179 Mich. App. 761, 771 (1989).  However, where a claim is based on emotional injury alone, "more in the way of outrage" may be required.  *Roberts*, 422 Mich. at 609 (citing Restatement Torts, 2d § 46, Comment K, p. 78).

Defendants can hardly deny that if juror credit Plaintiffs' testimony, they could find that Defendants' alleged acts against Plaintiffs at the Royalty House and jail were "extreme and outrageous" and intentional or reckless.  With the exception of Timothy and Preka Berishaj, however, Plaintiffs present no evidence to show that they suffered "severe emotional distress."  Timothy and Preka each testified that they suffered emotional distress from the incident and that they required treatment through counseling.  *See* Pl. Exhs. G at p. 20-21; Exh. O at p. 7, 52.  This evidence is sufficient to satisfy the final elements of an IIED claim.  None of the remaining Plaintiffs, however, direct the Court to any evidence which would satisfy their burden.  Consequently, the Court denies Defendants' motion against Timothy and Preka Berishaj, but grants it against the remaining Plaintiffs.

**B.    Defendant City of Warren**

Plaintiffs assert that the City of Warren is liable under §1983 for its failure to train its officers on the use of the restraint chair.  Plaintiffs alleged in their Complaint that the City was liable for failure to train on multiple grounds.  *See* Fourth Amended Complaint, Count I.  In their Response brief, however, Plaintiffs only defend their claim with respect to the Defendants' use of the restraint chair.  Therefore, the remaining grounds asserted are deemed abandoned.

"To prevail in a §1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom."

37

*Thomas v City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005), *cert. den.,* 126 S. Ct. 338 (2005)(*citing Monell v Dep't of Social Services*, 436 U.S. 658, 694 (1978)). "[T]he inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton v Harris*, 489 US 378, 388 (1989).

A plaintiff must prove that: 1) the training program is inadequate to the tasks that the officers must perform; 2) the inadequacy is the result of the city's deliberate indifference; and 3) the inadequacy is closely related to or actually caused plaintiff's constitutional injury. *Id* at 388-390; *Hill v McIntyre,* 884 F.2d 271, 275 (6th Cir. 1989).

Plaintiffs Timothy and Djeto Berishaj contend that Defendants' use of force training is inadequate because it does not include training or a written policy regarding the proper use of the restraint chair. The question remains though, whether this alleged inadequacy is the result of deliberate indifference and whether it is the actual cause of Plaintiffs' alleged constitutional injury. Plaintiffs fail to make either showing.

Deliberate indifference can only be established by showing that "in light of the duties assigned to specific officers or employees[,] the need for more or different training [was] so obvious, and the inadequacy [was] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton,* 489 U.S. at 390. Plaintiffs have to show that the inadequacy of training was so likely to result in a constitutional injury that the City could be deemed "callous and indifferent to the need for training." *Russo v City of Cincinnati*, 953 F.2d 1036, 1049 (6th Cir. 1992)(J. Wellford concurring).

Plaintiffs failed to present any evidence as to why it should have been obvious to

38

the City of Warren that a constitutional violation was likely to occur without additional use of force training specific to the use of the restraint chair.  There is no evidence that there were prior allegations of misuse of the chair, or that any of the Defendants was prone to the type of behavior alleged.  Plaintiffs provide a copy of the restraint chair manufacturer's instructions and warnings, which state that the chair is only designed to restrain prisoners who are a danger to themselves or others, not as an instrument of punishment.  *See* Pl. Exh. A.

However, Warren Chief of Police, James Vohs, and Warren Detention Supervisor, Lieutenant Michael Herr, deny ever being made aware of these manufacturer warnings.  And, Plaintiffs have not shown that they were ever provided to the City, Vohs or Herr.

Furthermore, the Warren Police Department had a written policy that "officers use only the [minimum] amount of force necessary to effect an arrest, overcome resistance offered, to defend themselves or others, or to gain control in any instance where the use of force is authorized by law."  Def. Exh. QQ.  And, there was an unwritten policy that the chair was to be used to manage prisoners who are a danger to themselves or others.

Citing *Russo v City of Cincinnati*, *supra*, as analogous, Plaintiffs argue that the deficiencies they allege nevertheless raise a question of fact.  In *Russo*, the Sixth Circuit reversed the district court's grant of summary judgment to the city on plaintiff's claim that the city failed to adequately train its officers in the proper exercise of force against mentally disturbed individuals.  The Court looked to three key factors to find that there was a question of fact: 1) the officers admitted that they were frequently called upon to

39

deal with mentally ill individuals, but none of them could articulate the content of their training; 2) an Office of Municipal Investigations Report found the officers' training inadequate in certain respects and virtually nonexistent in others; and 3) plaintiff's expert concluded that the content of the training was inadequate because none of the officers understood the proper procedures for reacting to mentally ill individuals.

Timothy and Djeto Berishaj's reliance upon *Russo* is misplaced. They contend that they have presented even more compelling evidence than that presented in *Russo*. Namely they assert that: 1) the Defendant officers regularly use the chair during their supervision of prisoners; 2) there is no written policy or specific training in the use of the chair; 3) Chief Vohs and Lt. Herr admit that they were unaware of the chair manufacturer's warnings; and 4) Vohs and Herr admit that the chair can be considered a use of force which must be justified and could be abused.

Unlike the expert and administrative reports in *Russo*, however, none of these facts, individually or collectively, suggests an inadequacy that should have been obvious. As stated, Plaintiffs have not shown that Vohs or Herr knew or should have known about the manufacturer's warnings, and there is no evidence of prior abuse of the chair, despite the discretion afforded officers who regularly use it and the potential for abuse. Further, the *Canton* Court explicitly held that constitutional inadequacy cannot be shown by the mere fact that "an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." 489 U.S. at 391. Therefore, the fact that there was no specific policy or training does not alone suggest the "callous" disregard Plaintiffs are required to show.

40

For all of these reasons, the Court finds that Plaintiffs failed to meet its burden on this claim.  Defendant City of Warren's motion for summary judgment is granted.

## V.    CONCLUSION

Defendants' motion is GRANTED IN PART and DENIED IN PART.  Specifically, the Court:

A.    GRANTS Defendants Lonnie Kirby, Bonacorsi, Wooster and Crown's motion in its entirety;

B.    GRANTS Defendants' motion in its entirety against Kristina Berishaj;

C.    DENIES Defendants' motion as to each Plaintiffs' claim of excessive force at the Royalty House, in violation of 42 U.S.C. §1983;

D.    DENIES Defendants' motion as to Plaintiffs Preka, Timothy and Djeto Berishaj's claim of excessive force at the jail, in violation of 42 U.S.C. §1983, but GRANTS Defendants' motion against Plaintiff Steve Gjonaj;

E.    DENIES Defendants' motion as to Plaintiffs' claim of violation of 42 U.S.C. §1985;

F.    DENIES Defendants' motion as to Plaintiffs Lena and Djeto Berishaj's claims of malicious prosecution, false arrest and false imprisonment, but GRANTS Defendants' motion against the remaining Plaintiffs;

G.    DENIES Defendants' motion as to Plaintiffs' claim of gross negligence;

H.    DENIES Defendants' motion as to Plaintiff Djeto Berishaj's claim of assault, but GRANTS Defendants' motion against the remaining Plaintiffs;

I.    DENIES Defendants' motion as to Plaintiffs' claim of battery;

J.    DENIES Defendants' motion as to Plaintiffs Timothy and Preka Berishaj's

41

claim of IIED, but GRANTS Defendants' motion against the remaining

Plaintiffs;

K.    GRANTS Defendant City of Warren's motion in its entirety.

Trial will proceed on:

1.    Fourth Amendment excessive force claims at the Royalty House--all

Plaintiffs;

2.    Fourth (or Fourteenth) Amendment excessive force claims at the jail--

Timothy, Djeto, and Preka Berishaj;

3.    42 U.S.C. §1985 claim--all Plaintiffs;

4.    Malicious prosecution, false arrest and false imprisonment--Lena and

Djeto Berishaj;

5.    Gross negligence--all Plaintiffs;

6.    Civil assault--Djeto Berishaj;

7.    Civil battery--Timothy, Preka, Lena and Djeto Berishaj;

8.    IIED--Timothy and Preka Berishaj.

**IT IS SO ORDERED.**

                          S/Victoria A. Roberts
                          Victoria A. Roberts
                          United States District Judge

Dated:  July 26, 2006

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on July 26, 2006.

S/Carol A. Pinegar
Deputy Clerk